R. H. GIBSON, APPELLANT, v. ST. JOSEPH LEAD COMPANY, RESPONDENT.—102 S. W. (2d) 152.

St. Louis Court of Appeals. Opinion filed March 2, 1937.

*Samuel Richeson* for appellant.

*Parkhurst Sleeth* and *Albert Miller* for respondent, St. Joseph Lead Company.

236

HOSTETTER, P. J.—This is a suit under the Workmen's Compensation Law, coming to this court by appeal on the part of the claimant from the Circuit Court of Washington County.

The following are the salient facts shown by the testimony.

The St. Joseph Lead Company, a corporation, whose regular and principal business is that of lead mining, owned, among other tracts

of land, 160 acres of timbered land in Washington County. The land belonging to the corporation was looked after by one M. M. Huff. This 160 acres was locally known as the Desloge tract and had been acquired by the corporation in 1929.

Mr. Huff in company with Mr. Will Miller examined the Desloge tract after having received information that much of the timber had been stolen therefrom, and, finding the report of the thefts was correct, he told Mr. Miller that if the Company got anything out of the timber something should be done about it right away and said that the company should have a royalty of $4 a thousand feet for the timber.

Sometime later, Mr. Miller approached Mr. Huff and told him that he had made arrangements to sell the timber at such a figure that he could pay the royalty of $4 per thousand feet and Mr. Huff said that was all the company wanted out of it and that if he could pay that he could cut the timber.

There was no agreement as to who would do the cutting for Mr. Miller and how much the timber should be sold for by him. Mr. Miller suggested the plan that the man to whom he sold the timber should remit to the Lead Company the entire amount and that they should deduct the $4 per thousand feet royalty and forward him a voucher covering his part of the sale. Later on they followed this plan.

The Superior Timber Company of Potosi, a corporation, was the purchaser of the timber from Miller, paying $9 per thousand feet for the timber delivered. This Superior Timber Company operated through Mr. Casey, its president, and the plan finally carried out was that when Miller would receive the proceeds from the sale of the timber to the Superior Timber Company he would send the checks directly to the St. Joseph Lead Company and that Company would keep $4 a thousand feet and send Miller a voucher for the difference. Miller was not on the salary roll of the St. Joseph Lead Company.

Miller's testimony was to this effect:

That most of his business was work he did for the community; that he dug ditches, made roads and, once in a while he got a contract from the Farming and Cattle Company for making ties; that he bought the timber on the Desloge tract from the St. Joseph Lead Company, through Mr. Huff, at $4 per thousand feet for stumpage after he had made a deal with Mr. Casey of the Superior Timber Company to sell the timber to him at $9 per thousand feet; that after contracting with Mr. Huff, representing the St. Joseph Lead Company, he gave Mr. Coleman a contract of cutting the logs for $1.25 per thousand, and Coleman asked him who to get for a partner and he (Miller) said, "Anybody you want," and then Coleman said maybe he could get Mr. Gibson (the claimant) and that he said that

would be all right with him, anybody he could get; that he also hired others to drag the logs after they were cut, that is, to skid them up, and others were hired to haul them into town where they were delivered to the Superior Timber Company; that he had working on the job Coleman and Gibson cutting down trees, Harper to drag the logs, Gross and two helpers, one to load and one to help haul the logs, and that he himself helped practically all the time; that he had no other men working for him on this or any other job at that time; that he advised Mr. Casey tô write the checks in the St. Joseph Lead Company's name; that he preferred that he do so in order to show his honesty and that all of them were written and delivered to the St. Joseph Lead Company.

R. H. Gibson, the claiman, testified substantially as follows:

That Will Miller hired him to do the work through Mr. Coleman; that he was hired on the 19th day of May 1934; that he and Coleman were to get $1.25 a thousand feet for cutting the timber; that he had worked two days and the third day about ten o'clock, on May 24, 1934, a pine tree that had been cut by them in falling caught on a leaning post oak tree, which swung the pine tree around so that it fell across him and injured him; that he received his money from Miller through Coleman for the work that he had done, $3.97; that there was no one else working there on May 24th, when he was injured except Coleman, but other men had been working there the day before; that Miller did not talk to him about employing him, but sent word by Coleman and that Coleman told him that he saw Miller and got them a job, which was cutting logs on the Desloge tract, and that after Coleman explained what the pay would be, he (claimant) said that he could go to work on Tuesday; that the arrangement between him and Coleman was that they were to cut timber together and divide the proceeds; that before he got hurt he asked Miller why he didn't pay so much a.stick for cutting the logs in place of paying by the thousand, and that Miller said they wouldn't let him.

W. H. Casey testified that he was in the timber business on May 24, 1934, and had handled some pine logs from the 160 acres of timber land belonging to the St. Joseph Lead Company, being the timber that Miller had previously made arrangements to bring to him; that he sawed up the lumber and paid the St. Joseph Lead Company for the timber; that Miller told him that this was the timber from the St. Joseph Lead Company's land; that he made arrangements with Miller as to how much he would pay him for it and Miller told him to make the checks payable to the St. Joseph Lead Company and that he did that; that the timber was delivered to him either by Miller or by log haulers working for Miller; that he was buying timber from other places also; that he paid for the lumber delivered by Miller or his men every two weeks; that when

the check was made up he gave it either to Miller or to the log hauler who delivered it; that he paid $9 a thousand for the pine timber; that he never received instructions from anybody except Miller that he should make the checks payable to the St. Joseph Lead Company; that he never had any conversation with Mr. Huff prior to the date of this accident; that he was president of the Superior Lumber Company and as such officer bought the lumber from Miller.

Amos Coleman testified that he was working with climant, R. H. Gibson, on May 24, 1934, when he was injured by the falling pine tree; that he had a conversation with Miller a few days prior to that regarding going to work on the St. Joseph Lead Company's land, and Miller said that he had a job for him (Coleman) if he wanted it and he asked what it was and Miller said that it was a job of cutting logs and also said, "You can get Mr. Gibson, or anybody you want to help;" that they agreed on the price to be paid, which was $1.25 a thousand feet; that he told Miller that he would see Gibson (claimant) and if he agreed they would work together and cut some for him; that he and Gibson did cut the logs and Miller paid them; that the amount paid was nearly $4 apiece, or, actually $3.97 each; that he and Gibson were sawing down a pine tree and there was a little post oak leaning over and the pine tree hit down on this post oak tree and slid around and knocked Gibson down and dragged him eight or ten feet on the ground and stopped with the butt across his body; that when Miller paid him for the timber which he and Gibson had cut, he gave him (Coleman) the entire amount and he paid Gibson his part.

M. M. Huff testified that he was employed by the St. Joseph Lead Company to look after its land and leases; that the Lead Company had paid Miller for ties which he had made from timber on Company land; that it was not the practice of the Company to have the timber cut on its different strips of land, that it only did that in an emergency; that he had learned that the timber on the Desloge 160 acre tract was being stolen; that on inquiry from Miller the latter told him that he had heard the same thing; that they then investigated and found that about eighty per cent of the oak timber had been cut off and soft pine also had been cut, and that he told Miller that if the Company got anything out of the timber they would have to do something with it right away; that Miller asked him how much he would have to have, and that he replied that the Company would have to have a royalty of $4 per thousand feet; that some weeks later Miller came to Bonne Terre and told him that he had made arrangements to sell the timber whereby he could pay him (Huff) $4 a thousand for the timber and that he told him that was all the Company wanted out of it and if he (Miller) could pay that, he could go ahead and cut the timber; that he did not tell Miller how to cut

the timber; that no limit was placed as to the amount of timber Miller could cut and no agreement as to when it would be cut, and no agreement as to who would do the cutting and no agreement as to whom the timber would be sold, and no agreement as to how much it should be sold for; that that was all that was done and said except Miller suggested that the man he sold the timber to should remit to the Company the entire amount and the Company would deduct the amount of $4 per thousand and forward the voucher to cover his (Miller's) part of the sale; that later on, they did that; that he told Miller that would be all right, that he was sure Miller would get paid for it; that the timber was sold by Miller to the Superior Timber Company of Potosi; that that Company paid $9 per thousand for the timber delivered; that he had no connection with Mr. Casey, the President of the Superior Timber Company; that he never told Casey how to pay the St. Joseph Lead Company, in what manner, or anything about it; that the checks did not come to him from Mr. Casey, but Miller brought the checks in or mailed them in; that the St. Joseph Lead Company kept $4 a thousand out of it and sent Miller a voucher for the difference; that he was never over on the Desloge tract while the timber was being cut before the accident; that he gave no directions to Miller as to what length to cut and didn't know what length he was cutting; that he didn't supervise Miller in any way about the lumber; that he did not tell Miller where to take the timber to sell it; that Miller helped load logs all the time they were being hauled and delivered to the Superior Lumber Company; that Miller was not on the St. Joseph Lead Company's payroll; didn't draw a salary or never had; that so far as he knew Miller never had been on the payroll of the St. Joseph Lead Company; that for the ties which Miller had made on the Company's land he was paid by the Bonne Terre Farming and Cattle Company.

The claim for compensation was filed with the Workmen's Compensation Commission on September 4, 1934, and in the claim the St. Joseph Lead Company was listed as the employer and later the name of Will Miller was listed as an additional employer.

In its answer the St. Joseph Lead Company denied all the statements contained in the claim, from one to eighteen inclusive; denied that it was ever an employer of claimant, R. H. Gibson, and further stated that it had no knowledge of the accident except as given in the claim for compensation and as given in a letter by an attorney for claimant, under date of June 16, 1934.

Upon a hearing there was testimony to the effect that Will Miller never had as many as ten employees at any time.

Upon a hearing on March 13, 1935, the full commission made an.

award denying compensation to claimant, affirming the Referee's award of February 25, 1935, the finding being as follows:

"We find from the evidence that R. H. Gibson was not an employee of the St. Joseph Lead Company, but rather of one Will Miller; that the relationship between the St. Joseph Lead Company and Will Miller was that of vendor and vendee and not that of master and servant; and that Will Miller was a minor employer and was not operating under the Workmen's Compensation Law. Therefore, compensation must be denied.

"Affirming on review award dated February 25, 1935."

The general holding of the courts in all jurisdictions is to the effect that standing trees are a part of the real estate as much so as the soil itself and being a part of the real estate the title to same may be conveyed only in accord with the statute providing for the conveyance of real estate, which is ordinarily by deed.

This doctrine is recognized in Missouri in the following cases: Potter v. Everett, 40 Mo. App. 152; Morgan v. Pott, 124 Mo. App. 371, loc. cit. 377, 101 S. W. 717; Cooley v. K. C. P. & G. R. R. Co., 149 Mo. 487, loc. cit. 493, 51 S. W. 101.

However, it does not necessarily follow that a verbal sale of standing trees may not ultimately become, in a measure, effective in transferring title to the vendee after the trees have become severed from the soil. Such verbal sale of standing trees has been held in many jurisdictions as a license to the vendee to enter upon the premises and cut and remove the timber until this license is in some manner revoked. And, it has also been held that where the vendor does revoke such license such revocation will not be effective as to the trees which have already been severed from the soil by the vendee, but will, of course, be effective as to those not so severed. A few quotations from R. C. L., will be illuminative on this question.

"All of the cases dealing with the sale of standing timber, whether or not the agreement is considered as within the Statute of Frauds, give practically the same status to the right of the vendee of the timber to go upon the land to cut and remove. This right is a necessary incident to all sales of growing timber unless it is manifest that the vendor himself is to cut the timber, and, if not expressed in the agreement, it is considered as implied therein. Such a right, if it conferred upon the vendee the authority to enter on the land and then exercise a right or privilege at his own pleasure, free from the control of the owner of the land, during the continuance of the contract, would clearly confer on the vendee a right or interest in the premises which would be within the Statute of Frauds, and this conclusion is recognized by the decisions regardless of their attitude concerning the character of the sale of the timber, and so, in giving the right of entry effectiveness when granted by parol, it is con-

sidered a mere license, which confers only a privilege, and does not pass an estate and may, therefore, be revoked or countermanded at any time by the licensor. There is no question in view of the character given it that a valid license to enter upon land and to cut and remove timber may be given by parol. Such a license very often assumes the form of a sale, and it only fails to become a sale because it is not put in legal form. . . . The direct result of a parol sale of standing trees would be practically the same, whether the agreement be considered as within the Statute of Frauds and therefore void or voidable, or whether it be considered valid, and not within the statute. The purchaser would be entitled to enter upon the land and to cut and remove the timber purchased until his license is revoked. . . . The contract, even if within the statute, is not properly speaking invalid, as the statute only inhibits all actions brought to enforce the contract, and so where it has been in part performed, the rights, duties and obligations of the parties resulting from such performance stand unaffected by the statute. A license cannot be revoked as to acts done under it. The revocation is prospective, not retrospective. Therefore it cannot affect the title to the vendee of trees severed at the time of revocation, and, in some instances, where the licensee has made expenditures upon the faith of the license, it cannot be revoked at the will of the licensor, unless the licensee can be placed *in statu quo*." [17 R. C. L., pp. 1073, 1075.]

In Giles v. Simonds, 15 Gray 441 (Mass.), 77 Am. Dec. 373, the court had under consideration the nature and revocability of a verbal contract made by the owner of land for the sale of standing timber to be cut and severed from the freehold by the vendee and removed therefrom by him and held that the license to the vendee to enter on the land for such purposes is revocable so far as it relates to timber not cut at the time of such revocation.

Such holding as to the non-revocability of the license to the vendee to enter on the land and remove the trees after he has severed them from the soil is based on the fact that it would be a breach of good faith to permit such a license to be revoked because the vendee had to spend money and services in severing the trees from the soil, and that so far as they have been severed from the freehold they have been converted into personal property and the title to the trees has vested in the vendee and that the license has been executed *pro tanto* and that a revocation of the license would operate as a fraud on the vendee "and deprive him of property to which he had become legally entitled." And, in discussing the nature of such a verbal contract the court used the following language, viz.:

"That such a contract is not invalid, as passing an interest in the land, is too well settled to admit of doubt. It is only an executory contract of sale, to be construed as conveying an interest in the trees

when they shall be severed from the freehold and shall become converted into personal property. Nor does the permission to enter on the land, which such a contract expressly or by implication confers on the vendee, operate to create or vest in him any estate or interest in the premises. It is only a license or authority to do certain acts on the land, which, but for such license or authority, would be acts of trespass. If it were otherwise, if under such a contract a right were conferred on the vendee to enter on the land and then to exercise a right or privilege at his own pleasure, free from the control of the owner of the land, during the continuance of the contract, it would clearly confer on the vendee a right or interest in the premises, which would contravene the Statute of Frauds. [R. S., ch. 74; sec. 1.] There can be no doubt that a valid license to enter on land may be given by parol. But this rule rests on the distinction that a license is only an authority to do an act or series of acts on the land of another, and passes no estate or interest therein. . . . The true distinction between an executory verbal license to enter on land under a contract for the sale of timber or trees growing thereon, and a similar license executed, seems to be this: the former confers no vested interest or property, no money or labor is expended on the faith of it, and no right or title is impaired or lost by its revocation. If the party to whom it is granted is injured by its withdrawal, his remedy is by an action against the licensor for a breach of the contract. It cannot be held to extend further, so as to confer a right to use the land of another without his consent, because it would thus confer, *ex proprio vigore,* an interest in land, which cannot be created except by a writing. But such a license executed to the extent to which it has been acted on has operated to induce the vendee to expend money and services on the property, and thereby to convert it into personal chattels which have become vested in him. The revocation of the license in such case would deprive the vendee of his property. It has therefore been held that such a license, while it is executory, may be countermanded, but that when executed it becomes irrevocable. [Cook v. Stearns, 11 Mass. 533; Choever v. Pearson, 16 Pick. 273; Ruggles v. Lesure, 24 Id. 190; Claflin v. Carpenter, 4 Met. 580 (38 Am. Dec. 381); Nettleton v. Sikes, 8 Id. 34.]''

A similar ruling was made in the following cases: Burton v. Scherpf (Mass.), 1 Allen, loc. cit. 135; Drake v. Wells, 11 Mass., loc. cit. 143; Hill v. Cutting, 107 Mass., loc. cit. 597; Delaney v. Root, 99 Mass., loc. cit. 548; White v. Foster, 102 Mass., loc. cit. 378; Poor v. Oakman, 104 Mass., loc. cit. 316; Owens v. Lewis, 46 Ind., loc. cit. 503.

When claimant and Coleman, under the facts as shown in the instant case, completed the severance of the pine tree from its stump

by ax or saw, a magical metamorphosis at that instant took place. The pine tree immediately changed its status from real estate to personal property and it also changed owners from the St. Joseph Lead Company, the vendor, to Miller, the vendee; and, when it toppled from its stump and descended towards the earth and was deflected in its descent by the post oak tree and fell on and injured claimant, it was Miller's personal property which inflicted the injuries.

Claimant makes two assignments of error, viz.: (a) That the facts found by the Commission do not support the award; (b) that there was not sufficient competent evidence in the record to warrant the making of the award.

It is urged in support of these two assignments of error by counsel for claimant that Miller was an independent contractor and that the relation of vendor and vendee did not exist between the St. Joseph Lead Company and Miller as to the timber because no deed was ever made conveying the timber to Miller and that the statement of Mr. Huff acting for the Lead Company, that the Company would have to have $4 per thousand feet as a royalty, further tended to negative the idea of treating the Lead Company and Miller as vendor and vendee, and cites the case of Superior Mineral Co. (Mo. App.), 70 S. W. (2d) 1104, as being in conflict with the ruling of the Commission in the instant case.

We are not impressed with this contention. The Woodruff case was written by Judge BECKER of this court and involved the mining of tiff and a construction of the mining statutes. The use of the expression by Mr. Huff of the payment of $4 a thousand on a royalty basis was applicable only to the regular and usual business in which the Lead Company was engaged, to-wit: the mining and milling of lead, and it is quite apparent from the language and conduct of Miller, and of Huff, representing the Lead Company, and of Casey, representing the Superior Lumber Company, the purchaser of the lumber from Miller, that they all regarded the transaction as a sale of the timber by the Lead Company to Miller at the price of $4 per thousand feet and the cutting of the timber and its delivery of same by Miller to Casey, the president of the Superior Lumber Company, as a sale of the timber by Miller at $9 per thousand.

The manner in which the Superior Lumber Company paid the $9 per thousand, did not change the actual nature of the transaction but was merely a matter of convenience, and, as Miller testified, he wished the checks to go first to the Lead Company to demonstrate his honesty. The method adopted made the Lead Company assured that it was getting its price per thousand, which, of course, was better than leaving the timber standing until all of it should be stolen.

The fact that Huff did call the $4 per thousand a royalty, a term applicable to mining, did not make it a royalty, but it was still merely the price at which the timber was sold by the Lead Company to Miller. "A rose would smell as sweet by any other name."

The Workmen's Compensation Commission's finding was "that the relationship between the St. Joseph Lead Company and Will Miller was that of vendor and vendee and not that of master and servant." This is a finding of fact and not a conclusion of law. Such a finding is in the nature of a special verdict and, as such, is binding and conclusive if supported by any substantial, competent evidence. [Jones v. Century Coal Co. (Mo. App.), 46 S. W. (2d) 196; Leilich v. Chevrolet Motor Co., 328 Mo. 112, 40 S. W. (2d) 601.]

It is the general holding of the courts that where there is conflicting testimony the award of the Workmen's Compensation Commission is conclusive on the reviewing court as much so as would be the verdict of a jury which is supported by any competent substantial testimony. Neither is the reviewing court entitled to pass upon the weight of the evidence, or the credibility of the witnesses, such questions being purely in the province of the Commission. And, in determining whether the award of the Commission was supported by substantial, competent evidence, the reviewing court must consider only evidence most favorable to the award and all reasonable inferences deducible therefrom. [Snavely v. Delmar Hotel Company (Mo. App.), 84 S. W. (2d) 188, loc. cit. 193, and cases there cited; Moore v. Federated Metals Corporation (Mo. App.), 83 S. W. (2d) 208; Noto v. Hemp & Co. (Mo. App.), 83 S. W. (2d) 136, and cases there cited.]

We find there is sufficient, substantial testimony in the record to support the award of the Commission and that the circuit court correctly affirmed the action of the Commission, and we, accordingly, affirm the judgment of the circuit court. *McCullen, J.*, concurs. *Becker, J.*, not sitting.