Mauro **BRITO–PACHECO, Deceased; Michelle Pacheco, et al., Appellant,**

v.

**Tina's Hair Salon, Respondent;**

**Treasurer of the State of Missouri– Custodian of the Second Injury Fund, Respondent.**

No. WD 75062.

Missouri Court of Appeals, Western District.

April 30, 2013.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 28, 2013.

Application for Transfer Denied June 25, 2013.

Andrew J. Dickson, for Treasurer, State of Missouri, Kansas City, MO, for appellant.

Jerrold Kenter and Paul G. Danaher, Overland Park, for Michelle Pacheco, and Gregory J. Abella, Kansas City, MO, for Respondent Tina's Hair Salon, for respondent.

Before Division Three: ALOK AHUJA, P.J., and VICTOR C. HOWARD and CYNTHIA L. MARTIN, JJ.

ALOK AHUJA, Judge.

The Labor and Industrial Relations Commission denied workers' compensation benefits to the dependents of Mauro Bri-

to–Pacheco, who was murdered by a robber on August 10, 2009, while working at Tina's Hair Salon in Kansas City. The Commission found that the Salon was not Brito–Pacheco's statutory employer under § 287.040.[1] Brito–Pacheco's dependents appeal. We affirm.

## Factual Background

As of 2009, Mauro Brito–Pacheco had worked as a barber at Tina's Hair Salon for seven years. The Salon's owner, Augustina Diaz, and four other stylists also cut hair at the Salon at the time of Brito–Pacheco's death.[2] Brito–Pacheco was the only stylist in the shop that cut hair exclusively for men.

Diaz testified in detail concerning the terms of her arrangement with the stylists who worked at the Salon, including Brito–Pacheco.

Diaz provided the stylists with shampoo, hair spray, and hair-coloring products. Each stylist provided his or her own equipment, including combs and brushes, clippers, hair dryers, and aprons. Diaz did not provide the stylists with any training, or uniforms.

Each stylist working at the Salon verbally agreed to pay Diaz fifty percent of the money they received from cutting and styling hair at the Salon. To allow Diaz to keep track of the money the stylists received, they would write down the name of the customers for whom they performed services, and the amount charged, in a shared appointment book. Diaz would collect her share of the stylists' revenues on a daily basis. Diaz emphasized in her testimony that she did not pay the individual

stylists; instead, the customers paid them, and they paid Diaz her fifty percent share. Diaz did acknowledge, however, that on the infrequent occasions when customers paid by check, the checks would be made payable to her, and she would pay the stylist their share of the fee.

The Salon leased space in a two-story building which also housed an income-tax service operated by the building's owner. The stylists were each given their own key to the Salon. Diaz established business hours of 10:00 a.m. through 8:00 p.m.; she testified that the stylists were not authorized to take appointments outside of those hours. Diaz later testified, however, that Brito–Pacheco frequently worked at the Salon beyond its closing time, and was also free to come in before the designated opening time when necessary. Diaz agreed that Brito–Pacheco "could come in early or stay later and work pretty much whatever [sic] he wanted."

Diaz did not pay any taxes on behalf of the stylists and did not provide the stylists with any insurance or fringe benefits. Their sole compensation was their fifty percent share of the amounts received from clients.

Each stylist maintained his or her own client lists, set the prices they would charge, and collected money from their own clients. Although each stylist "had their own prices," Diaz testified that the stylists as a group had agreed to a minimum price for haircuts (although not for other services). Diaz also testified that new stylists would ask her for her pricing, as a benchmark for establishing their own.

---

1. Statutory citations refer to the 2000 edition of the Revised Statutes of Missouri, as updated by the 2012 Cumulative Supplement.

2. In the record and briefing, the full surname of Mr. and Mrs. Brito–Pacheco is sometimes abbreviated as Brito or Pacheco. Consistent with the caption on appeal, we have chosen to use the full surname Brito–Pacheco to refer to both husband and wife in this opinion. We regret any error in this usage, and intend no disrespect.

It was common for stylists to give free haircuts to friends and family members; when that occurred, Diaz received no fee, because the haircuts generated no revenue to be divided. Diaz testified that, if Brito–Pacheco failed to show up for work and had clients waiting, no other stylist would cut those clients' hair: "[h]e care for his own customers and the customers they don't let nobody cut." If Brito–Pacheco was not there, his clients would wait.

Diaz testified that, if the Salon had walk-in customers, the walk-ins would be assigned to a stylist "by turn."

The stylists made their own appointments and set their own working hours, and could work as much or as little as they chose. They could also take vacation whenever they chose. Diaz testified that the stylists had no obligation to inform her of their appointments, or if they would not be coming in because they were sick. The stylists were responsible for obtaining a substitute if they wanted one, on days they could not come in to work; Diaz testified that frequently a stylist who could not come to work would call another stylist to cover for them. Because Diaz did not know who the stylists' customers were, or when those customers had appointments, it was up to the stylists to inform their clients if the stylist was unable to keep an appointment.

Diaz did not do any advertising for the Salon. A sign on the building identified the business as "Tina's Hair Salon." The Salon had a single phone line, which any available stylist would answer. Diaz provided the stylists with business cards listing the Salon's name, which had space for the stylists to write their own name and telephone number; the stylists could use the cards as they saw fit, and were free to have their own individualized business cards printed.

Diaz testified that, when Brito–Pacheco first began working at the Salon, he worked only on weekends, but that he later quit another job he was working, and began working longer hours at the Salon.

Brito–Pacheco's wife testified that, on the day of his murder (August 10, 2009), she was working when she received a call from him, indicating that he had been called in to work to substitute for another stylist. Mrs. Brito–Pacheco testified that, because they did not have any other baby-sitter available, she left work early to watch their children. She also testified that it was mandatory for Brito–Pacheco to go to work when he was called on August 10, 2009, and that he would have been reprimanded or disciplined by Diaz if he had failed to appear. Diaz testified that she did not call Brito–Pacheco to come in to the Salon on the day he was murdered, that he would not have been reprimanded or disciplined if he had not appeared, and that she had never reprimanded or disciplined any stylist for non-attendance at the Salon. She acknowledged that it was possible that another stylist had called Brito–Pacheco on that day to cover for him.

Diaz testified that she was not working at the Salon when Brito–Pacheco was murdered. Brito–Pacheco, another stylist, and a customer were present at the time. Diaz received a call at 6:00 p.m. from the other stylist, informing her of the robbery and Brito–Pacheco's shooting. She reached the Salon shortly thereafter.

After his death, Brito–Pacheco's wife filed a claim for workers' compensation benefits. Following a hearing, an administrative law judge within the Division of Workers' Compensation issued a decision finding that Brito–Pacheco was not an employee of Tina's Hair Salon at the time of his death, and that no workers' compensa-

tion benefits were therefore owing. The ALJ's decision found:

> Tina's Hair Salon operates as a sole proprietorship by Tina Diaz. Diaz testified that she supplied a work station and shampoo-chemical supplies to the hairdressers. Diaz also provided salon business address cards to which operators could add their name. Diaz did not schedule appointments, limit or mandate work hours, provide employee benefits, pay taxes or mandate fees. Basically the hairdressers would use the space provided and divide the proceeds of compensation paid by customers. Diaz did not have workers' compensation, fire or liability insurance.

> On August 10, 2009, Pacheco was home caring for his children when another hair dresser "Hugo" called to see if Pacheco could cover his appointments at Tina's Hair Salon. It was during that shift that the salon was robbed and Pacheco killed.

> Diaz did not call Pacheco to work that day and was unaware that he was working.

Based on these findings, the ALJ concluded that Brito–Pacheco was not an employee of the Salon either under the common law, or as a "statutory employee" under § 287.040. The Commission adopted the ALJ's decision as its own, over the dissent of one of its members. Brito–Pacheco's dependents appeal.

### Standard of Review

■ "In the workers' compensation context, where the facts are not in dispute as to the nature of the agreement and the work required by it, the existence or absence of statutory employment is a question of law for the courts to decide.'" *McCracken v. Wal–Mart Stores East, LP,* 298 S.W.3d 473, 476 (Mo. banc 2009) (quot-

ing *Bass v. Nat'l Super Mkts.,* 911 S.W.2d 617, 621 (Mo. banc 1995)).

### Analysis

■ Appellants do not dispute that Brito–Pacheco was an independent contractor. They argue, however, that Brito–Pacheco's arrangement with Tina's Hair Salon satisfied all of the requirements necessary to render him a statutory employee, and that the Commission's decision must accordingly be reversed. We disagree.

■ Section 287.040.1 provides:

> Any person who has work done under contract on or about his premises which is an operation of the usual business which he there carries on shall be deemed an employer and shall be liable under this chapter to such contractor, his subcontractors, and their employees, when injured or killed on or about the premises of the employer while doing work which is in the usual course of his business.

Section 287.040.1 "is designed to prevent employers from evading the Act's requirements by hiring independent contractors to perform work the employer otherwise would hire ordinary employees to perform." *McCracken,* 298 S.W.3d at 480 (citing *Bass,* 911 S.W.2d at 619).

■ The party asserting the existence of statutory employment bears the burden of proving that an injured worker comes within § 287.040.1. *Id.* Proof of statutory employment requires proof of three elements.

> One is a statutory employee if (1) the work is performed pursuant to a contract, (2) the injury occurs on or about the premises of the alleged statutory employer and (3) the work is in the

usual course of the alleged statutory employer's business.

*Id.* (citing *Bass,* 911 S.W.2d at 619).

We assume for purposes of our analysis that the first and second elements are satisfied here. We conclude, however that Brito–Pacheco's work was not performed "in the usual course of the alleged statutory employer's business," within the meaning of the third element.

*McCracken* states that "the usual course of business" consists of

"those activities (1) that are routinely done (2) on a regular and frequent schedule (3) contemplated in the agreement between the independent contractor and the statutory employer to be repeated over a relatively short span of time (4) the performance of which would require the statutory employer to hire permanent employees absent the agreement."

*Id.* (quoting *Bass,* 911 S.W.2d at 621).

In this case, when he was cutting hair Brito–Pacheco was not doing the work of his putative employer, Tina's Hair Salon. Instead, he was doing his own work: he had his own clients, whom he charged what he chose, for haircuts he performed when he chose. The haircuts Brito–Pacheco performed were not work *of the Salon,* which Brito–Pacheco had been assigned to perform; instead, Brito–Pacheco had developed his own clientele, and according to Diaz's testimony, Brito–Pacheco's clients would not permit other stylists to cut their hair when Brito–Pacheco was unavailable. The Salon would not have had to hire other employees to do Brito–Pacheco's work if he was unavailable; in Brito–Pacheco's absence, that work simply would not have existed to be done.

Rather than contracting with Brito–Pacheco to have him perform some portion of the Salon's work, the Salon simply provid-

ed Brito–Pacheco with a facility within which he could ply his trade, in exchange for a share of the revenue he generated. It was up to Brito–Pacheco what use he made of the Salon's facilities, and what income he generated from his use of those facilities. He used his own equipment to cut his clients' hair, and decided for himself how to perform the work he conducted. He set his own prices, and worked as much or as little as he chose.

Prior Missouri cases have recognized that, where an alleged statutory employer merely provides another entity with the facilities in which to engage in revenue-generating activity, the entity providing the facilities is not a statutory employer under § 287.040.1. For example, in *Perrin v. American Theatrical Co.,* 352 Mo. 484, 178 S.W.2d 332 (1944), a musician was injured while working for a touring entertainment troupe which was performing a one-week engagement at a theater in St. Louis. The theater company's contract with the touring company required the theater company to make the theater available in a clean, lighted, and heated condition, with the scenery and equipment on hand; the theater company was also required to provide ushers, ticketsellers, doorkeepers, stagehands, extra musicians, and janitorial staff. *Id.* at 333. The agreement provided for the touring company and the theater to divide the revenues generated by the touring company's performances. *Id.*

*Perrin* held that, in these circumstances, which are roughly analogous to the circumstances of our case, the theater company was not the musician's statutory employer. The Court reached this result by "approv[ing] and adopt[ing]" the analysis of a similar issue in *Madison Entertainment Corp. v. Kleinheinz,* 211 Wis. 459, 248

N.W. 415 (1933),[3] which held that the proprietor of an athletic field was not the statutory employer of a baseball player on a team which played its home games at the field. *Perrin* quoted the following explanation from *Madison Entertainment:*

> The Madison Entertainment Corporation was not organized to give entertainments through and by its employees. Its business was the promotion of entertainments in order to exploit the facilities of the baseball field. Its position was analogous to that of the owner of a theater who gives guaranties to traveling shows in order to promote the profitable operation of the plant constituting the theater. *Its business was furnishing of facilities for giving entertainments, rather than the giving of them through its own efforts.* Hence the corporation was not attempting to discharge its business through independent contractors and thus avoid the necessity of doing business through direct employees.

*Perrin,* 178 S.W.2d at 334 (emphasis added) (quoting *Madison Entm't,* 248 N.W. at 416–17).

Similarly, in *Ramsey v. Gross & Janes Co.,* 241 S.W.2d 777 (Mo.App.1951), the workers' compensation claimant, Ramsey, entered into an agreement with the owner of a saw mill, Gross & Janes Company, under which Ramsey would operate the saw mill in exchange for a payment to Gross & Janes of a fee based on the amount of lumber processed at the mill. *Id.* at 778. The agreement required Ramsey to sell all of the lumber which was cut into railroad ties to Gross & Janes, and gave him the right to cut timber on other land Gross & Janes owned (although Ramsey could also harvest timber elsewhere). *Id.* Gross & Janes exercised no control over the manner in which Ramsey operated the mill. *Id.* at 780.

In these circumstances, this Court held that Gross & Janes was not Ramsey's statutory employer.

> Ramsey was not employed to cut timber and manufacture cross-ties for appellant; nor did he receive any compensation from appellant for work done on the latter's premises. *Ramsey was in business for himself, and not in the service of appellant.* The cross-ties and lumber he cut for himself, and when manufactured belonged to Ramsey and not to appellant. The lumber manufactured was sold on the open market by Ramsey for his own benefit. The cross-ties were, by the terms of the contract, sold to appellant.
>
> Nor was the work performed by Ramsey shown to be an operation of the usual business which Gross & Janes Company conducted on the premises in question. It does not clearly appear what the appellant's business actually was. It might be inferred that said company was engaged in the business of buying and selling cross-ties. Buying and selling cross-ties is a different occupation from cutting timber and manufacturing cross-ties and lumber, so that if we assume that appellant carried on its business on the premises in question, respondent has failed to make out a case under Section 287.040, supra.
>
> ... *The ownership of the mill and the renting of it in order to obtain revenue, or to promote the supply of*

---

**3.** Overruled by *Green Bay Packaging, Inc. v. Dep't of Indus.,* 72 Wis.2d 26, 240 N.W.2d 422 (1976). Notably, in overruling *Madison Entertainment, Green Bay Packaging* adopted a standard for determining statutory employment (performance of services "which are integrally related to the finished product or service provided by that principal employer," *id.* at 428) which the Missouri Supreme Court rejected in *Bass,* 911 S.W.2d at 620–21.

*cross-ties which the company would buy, does not put the appellant in the business of cutting timber, and the business of manufacturing cross-ties and lumber,* so that it can be said that Ramsey was engaged in "an operation of the usual business which he (the employer) there carries on."

*Id.* at 781–82 (emphasis added).

We reached the same result in *Miller v. Am. Royal Ass'n,* 140 S.W.3d 74 (Mo.App. W.D.2004). *Miller* involved a charitable organization whose mission was to "provid[e] agricultural education to children and adults in the Kansas City region." *Id.* at 75. The Association staged (and continues to stage) a large and well-known annual event in Kansas City, featuring various forms of agriculture-related entertainment and contests. *Id.* Among other things, the Association hired a rodeo company to stage a rodeo during the annual event. *Id.* at 75–76. Miller was injured while working for the rodeo company.

Even though the Association advertised the rodeo as part of its annual event, shared in the rodeo's revenues, and supplied maintenance employees who "may sometimes clean up after the livestock or set some equipment up," *id.* at 78, we held that Miller was not a statutory employee of the Association, because the staging of the rodeo was not part of the Association's "usual business." We emphasized that, "[w]hile the rodeo may have been financially lucrative to or an integral part of the American Royal show, that is not the test." *Id.* at 79. We noted that staging rodeos is a specialized activity, requiring expertise the Association did not have. Given this fact, "[a]bsent the American Royal's agreement with Harry Vold Rodeo, the American Royal would not have to hire permanent employees to load livestock into chutes as Mr. Miller was assigned to do for the rodeo when he was injured; there would be no rodeo, so there would be no livestock to handle." *Id.*

Other cases reach the same result: where an entity possessing certain facilities gives another entity access to those facilities to permit the non-owner to engage in its own business operations, the owner does not thereby become a statutory employer of the non-owner's employees, even where the facility owner has a financial interest in the non-owner's operations, and engages in various activities to facilitate those operations.[4]

---

4.  *See, e.g., Dillard v. Leon Dickens/Forklift of Cuba,* 869 S.W.2d 317, 319–20 (Mo.App. S.D. 1994) (forklift repair company was not the statutory employer of employee of metal salvage company, which made agreement with forklift company to remove metal scrap for resale from forklift company's premises, even though forklift company would be paid a share of revenues generated by sale of scrap); *Dawson v. Clark Oil & Ref. Corp.,* 410 S.W.2d 353 (Mo.App.1966), and *Johnson v. Simpson Oil Co.,* 394 S.W.2d 91, 97–98 (Mo.App.1965) (both cases holding that the lessor of an automobile service station was not the statutory employer of the service station's employees, even though lessee was required to purchase various petroleum products from lessor, lessee was required to pay a fee to lessor based on sales, and the lessor exercised some measure of oversight of lessee's operation of sta-

tion); *Gibson v. St. Jos. Lead Co.,* 232 Mo. App. 234, 102 S.W.2d 152, 158 (1937) (lead mining and milling company was not the statutory employer of a man who agreed with lead company to harvest timber on lead company's land, and pay lead company a portion of the revenues generated by timber sales). The *Dillard* and *Johnson* cases were overruled on other grounds by *Hampton v. Big Boy Steel Erection,* 121 S.W.3d 220, 222 (Mo. banc 2003).

In *Childers v. Town & Country Suzuki Sales, Ltd.,* 624 S.W.2d 863 (Mo.App. E.D.1981), the Court found statutory employment to exist where an individual operated a motorcycle service department in facilities rented from a motorcycle dealership. The decision does not address the "usual course of business" requirement. But *Childers* is distinguishable in

Under these decisions, we cannot hold that the Salon was Brito–Pacheco's statutory employer, because the work he performed was not "in the usual course of [the Salon's] business." *McCracken*, 298 S.W.3d at 480. To the contrary, the Salon merely provided Brito–Pacheco with the facilities he needed to conduct his own business operations in the manner he chose. Brito–Pacheco was in business for himself; he was not doing the Salon's work. The result we reach is reinforced by the fact that, in 2005, the General Assembly "shift[ed] ... course" by directing that "reviewing courts shall construe the provisions of th[e] [Act] strictly.'" *McCracken*, 298 S.W.3d at 481 (quoting § 287.800). Even if Brito–Pacheco were to be considered a statutory employee under pre–2005 caselaw, the same result would not necessarily hold at the time of his murder in 2009.

We recognize that the Salon undoubtedly had a financial interest in Brito–Pacheco's activities, and would have made arrangements to have another stylist operate out of the Salon if Brito–Pacheco had ceased working there. As we explained in *Miller*, however: "[w]hile [Brito–Pacheco's work] may have been financially lucrative to ... [the Salon], that is not the test." 140 S.W.3d at 79.

We also recognize that Diaz, the Salon's proprietor, was herself a hair stylist, and that she conducted the same type of business at the Salon as Brito–Pacheco did. But § 287.040 imposes "no limitation to the number of distinct business enterprises any company may engage in." *State ex rel. MSX Int'l, Inc. v. Dolan*, 38 S.W.3d 427, 430 (Mo. banc 2001).[5] Diaz made her arrangement with Brito–Pacheco in her capacity as the proprietor of the Salon, seeking to generate revenue by making hair-cutting facilities available to stylists for a percentage of their income; she did not deal with Brito–Pacheco in her capacity as a fellow hair stylist. In addition, Brito–Pacheco plainly did not assist Diaz in her own hair styling work: he did not work on her clients, or otherwise facilitate her servicing of those clients. The fact that Diaz was herself a hair stylist does not alter the nature of the business with which Brito–Pacheco dealt.

### Conclusion

The Labor and Industrial Relations Commission correctly held that Brito–Pacheco was not a statutory employee of Tina's Hair Salon. We affirm the Commission's Final Award Denying Compensation.

All concur.

---

any event: in *Childers*, the motorcycle dealership had previously operated the service department through its own employees (including the individual who later rented the space from the dealership); the dealership "was required by its franchisor, U.S. Suzuki, to maintain a service department"; and the service department remained integrated into the dealership's business operations, because dealership employees continued to assemble motorcycles in the service department's rented space, using the service department's rented tools, and the service department performed warranty work for the dealership's customers. *Id.* at 864.

5. Overruled on other grounds by *McCracken*, 298 S.W.3d at 479.